## No. 8282.

## T. H. FARIES VS. RANGER, FATMAN & CO.

In the construction of an ambiguous contract, the safest mode is to ascertain the intention and meaning of the parties to the contract, as shown by their own acts, and by the manner in which they proceeded to the execution of the same.

Hence, when a party orders a cotton buyer in an inland cotton market to buy a quantity of cotton for him of a stipulated quality and of a stipulated price, and a portion of the order is filled by the buyer within a delay of eleven days, without objection as to delay on the part of the purchaser, the contract will be construed as contemplating a reasonable delay for its execution.

By consent of parties the cotton buyer may replace inferior cotton by other cotton of the required standard; and after such consent, the fact of the buyer's offer of inferior cotton in execution of orders, will not be considered as a violation on his part of the original contract.

APPEAL from the Civil District Court for the Parish of Orleans. *Tissot*, J.

*F. C. Zacharie* for Plaintiff and Appellee.

*Miller, Finney & Miller* for Defendants and Appellants.

The opinion of the Court was delivered by

POCHÉ, J.  Plaintiff sues for the recovery of profits which he could have realized from a cotton contract which he had made with the defendants, and which he lost through their violation of the contract.

He charges that under two orders, dated respectively January 23d and 25th, 1877, he had been directed by defendants to purchase for them 1,000 bales of cotton of a stipulated quality and at a stipulated price, on the market of Shreveport, where he was then engaged in the business of cotton buyer; that while he was proceeding to fill said orders, and after he had bought for and delivered 453 bales of cotton to defendants, he was informed by them that they would receive no more cotton from him, and he alleges that by their said violation of the contract they caused him the loss of profits which he would have realized through the purchase of the remainder of the order, which he fixes at $1,422.20, and for which he obtained judgment in the District Court.

The answer is a general denial, but the real defense is that the defendants were justifiable in putting an end to the contract, for the reasons:

1.  Because the cotton which he had bought to complete the balance of the order was not of the required quality, and was under the stipulated standard.

2.  Because the order was not filled within the time prescribed in the contract.

As the 453 bales of cotton were shipped, accepted by the defendants and paid for, there is no dispute about that part of the order.

The undisputed facts shown by the record are as follows:

In January, 1877, plaintiff, a cotton buyer in Shreveport, operated with merchants in New Orleans through one J. F. Kraemer, his agent who resided in this city, and through whom he entered into negotiations with the defendants, touching large cotton transactions.

Their correspondence, mainly by means of cipher telegrams, culminated in an order from defendants to plaintiff for the purchase of 600 bales of cotton of a stipulated quality and for a stipulated price, which order was given on January 23, 1877, and was at once accepted by Faries.  It was followed by another order on January 25, 1877, for the purchase of three or four hundred bales under the same stipulations. The second order was accepted also by Faries, who telegraphed that he had already bought 700 bales and would fill the whole order by

night or early morning. No time was fixed in either order for the delivery of the cotton.

Simultaneously with the first order, the defendants by telegram opened credit for plaintiff by drafts on them for six hundred bales. As to the credit for the second order, Faries was referred to Landauer, a member of the defendant firm, who was announced to proceed in person to Shreveport, and who left on the next day, the 24th, for that place, where he arrived on the 26th.

On his arrival he at once called on Faries, who showed him the samples of the 700 bales purchased for them. After examination, Landauer accepted 453 bales of the lot and rejected the balance as of inferior quality. At that point begins the divergence of the testimony, and from that point flows the conflict.

Plaintiff's theory is, that under his contract he was allowed a delay of ten or twelve days to fill the order and to ship the cotton ; that it was agreed between himself and Landauer, the accredited representative of the defendant house, that he would replace the rejected cotton and to continue to fill the entire order with cotton of the required standard at the stipulated price, within a reasonable time, and that after going with him through the market and finding on hand no cotton to suit his order, and after instructing plaintiff to suspend his purchases temporarily, Landauer left on the same day for Galveston, whence he was to return shortly with currency, which had become very scarce in Shreveport, with a view to resume the suspended operations. But, that owing to a considerable decline in the prices of cotton in all the markets of the world, Landauer did not return, and the defendants ceased to correspond with him ; whereupon, he notified them, on the 6th of February, following, that he was ready to fill his contract, on which he was informed, for the first time, that the contract was abrogated and annulled by the defendants.

He asserts finally, that from the 26th of January to the 6th of February following, he was ready to fill the entire order within a delay of six days, and he had, during that time, the refusal of the cotton in quality and quantity necessary to fill the order.

Their proposition is that their contract, as explained by the custom and usages of trade, contemplated the filling of their order within twenty-four hours, and with cotton of the prescribed quality, both of which conditions had been violated by plaintiff, although he had telegraphed on the 25th that the whole order would be filled and completed by the morning of the 26th.

Both parties have introduced the testimony of witnesses touching the prevailing usages of trade which should regulate similar contracts. But we find a safer mode to guide us in the construction of this par-

ticular contract, by considering the manner in which the parties themselves understood it, as shown by their own acts.

The evidence shows that the 453 bales which were received without objection, and which made part of the order of January 23d, were shipped in three different consignments, made respectively on January 29th and 31st and February 2d; the last consignment being made in a delay of eleven days from the date of the order. It further appears that the samples of these 453 bales had been examined and accepted by Landauer on the 26th, and that to his knowledge the consignments had not yet been begun.

These circumstances are conclusive proof that a longer delay was contemplated by the parties than is now urged by the defendants, for the execution of the contract.

Now, Faries, in his testimony, explains to our satisfaction why he did not complete the order as he had promised in his telegram of the 25th: his operations were suspended by the arrival and in obedience to the orders of Landauer.

Defendants' counsel confidently rely on the testimony of Landauer to rebut and destroy that statement of plaintiff, and they point to a page of the record in which Landauer is represented to have said to Faries, with impressive distinctness, that " he could not buy for us." This language is held out as an order cancelling all unfilled orders from defendants to plaintiff, and to have been predicated on the failure of Faries to have bought cotton fit to be offered or received.

On this statement of facts counsel's conclusions are irresistible. But a careful examination of the record has created an entirely different impression on our minds, and has had the effect of satisfying us that the expression used by the witness Landauer, had reference to a particular lot of cotton which he was then examining and not to the further execution of their order by Faries.

In another part of his testimony, Landauer admits that when he left Shreveport for Galveston, his intention was to return to Shreveport, stay there a few days and return to this place by way of Memphis, but that his plan was frustrated by contrary orders from his house, thus corroborating Faries' statement concerning his intended return from Galveston.

Nothing in the record shows that either he or any other member of his house ever complained that Faries was taking too much time in filling these orders. On the contrary, the reason given by Ranger to Kraemer for cancelling their order was that the cotton was not up to the standard, and said nothing about unreasonable delay.

We thus find plaintiff's theory supported in the main by the testi-

mony of Kraemer and by his own testimony, which, if not corrobo-
rated by that of Landauer, is not refuted by any testimony in the
record.

We have not had the benefit of Ranger's testimony, a circumstance
which is to be regretted, because the orders were given by him
personally.

Our conclusion is, therefore, that plaintiff's theory is substantially
supported by the record, and we find no error in the judgment which
he has obtained.

Judgment affirmed.