Statement of the Case.
MONROE, J.
Levert Company (as we shall call the plaintiff). sued out executory process to enforce payment of a balance, exceeding $100,000, due upon certain notes, executed by Moore Company (as we shall call defendant), and secured by mortgage upon landed property in the parish of Terrebonne, and, the property having been seized, and advertised -to be sold on June 7, 1913, the sheriff was, upon that day, served with a writ of injunction, issued at the instance of Moore Company, prohibiting him from further proceeding in the matter, upon the ground, as alleged, that the time for the payment of the balance claimed had been extended to January 1,1914. The injunction had been issued without bond, agreeably to the provisions of C. P. arts. 739, 740, and Levert Company, proceeding under C. P. arts. 741, 743, ruled Moore Company into court to prove summarily the truth of the allegations upon which it had been obtained. ■ After hearing, the court a qua gave judgment for Levert Company dissolving the injunction, and the Moore Company prosecutes this appeal.
It appears from the evidence that Mrs. John T. Moore, Sr., “owns 790 to 800 shares” (constituting three-fourths) of the capital stock, and is president, that Joseph Austin Moore “holds” 7 shares, and is vice president, that J. R. McNaughten “holds” one share, and is secretary, and that the three thus named constitute the board of directors of the Moore Company; and we infer that the details of the business of the company were intrusted to the vice president, and that he was aided in handling them by the secretary. The mortgage sued on was executed on March 11, 1911, by the vice president, acting under the authority of a resolution of the board of directors, and contains the recitals that the Moore Company is indebted to the Levert Company in the sum of $34,881.79, for which it has given its five notes, one for $6,881.79, payable January 15, 1912, and the other four for $7,000 each, payable, respectively, on January 15th of the years 1913, 1914, 1915, and 1916, with interest at 6 per cent, per annum, payable annually, and that the Levert Company has agreed to advance $75,000 for the making of the crops for the year 1911, for which amount the Moore Company has given its note, payable January 1, 1912, said note to *80 be discounted at 8 per cent, and the proceeds to be placed to the credit of said company, and said company to be allowed like interest on its daily balances. The act contains the usual stipulations pledging and pawning the crop for the advances to be made, and for the payment of same from the proceeds, as also for the payment of attorney’s fees in case of suit upon any of the notes; and it provides for the payment (in part or in whole), from the proceeds of certain sugars and massecuite remaining from the crop of 1910, of the note for $6,881.79, due January 15, 1912, and the note for $7,000, due January 15, 1913. There also appears in the record a notarial act, of date February 2, 1912, whereby Misses Louise and Mary Tobin, J. R. McNaughten, and Mrs. John T. Moore, Sr., represented by Joseph Austin Moore, and the Bank of Lafouche, holders of notes of the Moore Company, secured by mortgage on the property here in question, to the aggregate amount of $97,711.03, declare:
“That they are cognizant of the fact that there is a prior mortgage on said property, which was granted to the J. B. Levert Company, Limited, * * * for $109,881.79, and a portion of this first mortgage * * * is represented by one note for $75,000, which represented the amount to be advanced by the J. B. Levert Company, Limited, for the * * * crop of 1911; * * * and that whereas, the J. B. Levert Company, Limited, has received from the proceeds of said crop of 1911 almost, if not quite, sufficient to pay said note, * * * but the said John T. Moore Planting Company, Limited, desires not to have said proceeds * * * applied to the payment of said $75,000 mortgage note, but to use the same for the purpose of carrying on and harvesting the crop of Í9Í2; and whereas, the said J. B. Levert Company, Limited, have expressed their willingness to allow this to be done, provided they do not lose the rank of the mortgage: * * * Now appearers do hereby agree and consent to the said J. B. Levert Company, Limited, not applying the proceeds of the crop of 1911 * * * to the payment of said $75,000 note, and consent that the said proceeds be used * * * for the carrying on and- harvesting of the crop of 1912, and that the J. B. Levert Company, Limited, or any future owner or holder of said note shall not be in any way prejudiced by this action, but shall retain the first mortgage * * * to secure the said $75,000 note, prior in rank to the mortgage securing the notes held by appearers. * * * ”
Prom the account herein filed by the Levert Company, and bearing date January 2, 1913, it appears that as the result of the transactions during the year 1912, including, as we presume, the sale of the produce left from the crop of 1910, the note for $6,881.79, due January 15, 1912, was paid, and the note for $7,000, due' January 15, 1913, was reduced to $4,122.07, with interest paid to July 7, 1912, the three notes for $7,000 each, due in 1914, 1915, and 1916, with interest from March 9, 1911, were still unpaid, and the note for $75,000’ due January 1, 1912, was unpaid in principal, though the interest was paid up to January 1, 1913. Beyond that it otherwise appears that the Moore Company was unable to pay -debts of a most pressing character, such as taxes, the license due for a store conducted by it, and the bills due for the stock of goods which had been purchased for the account of the same; in fact, though the Levert Company was reimbursed its current advances and received the payments on account, as stated, the year’s operations were, upon the whole, unprofitable, if not disastrous, and are said to have involved a loss of some $60,000 or more. Gen. Levert, representing the Levert Company, for reasons given by. him, decided to make no more advances to the Moore Company, and he was in that state of mind on January 1, 1913, when he was called upon by Mr. Joseph Austin Moore, and Mr. McNaughten, with a view to the making of an arrangement for the business of the ensuing year.
Mr. Moore gave the following, with other, testimony concerning their interview, to wit:
“We told the General we had come to see about business for the coming year, 1913, and Gen. Levert then told us that he had so much money tied up that he would not be able to put out any more money for the 1913 crop; and I then asked Gen. Levert if he meant by that that we had to take up his notes. Gen. Levert said, ‘No,’ he was secured, and that he would *82 hold his notes, and that he would be satisfied with the interest; and he then said that he had the confidential information to communicate that he was retiring from business, and he had heard * * * that the Bank of Lafourche was preparing to advance us on the crop. I told Gen. Levert that I had not heard of that, and he said that he had heard so, and for me to have Mr. Beattie see the bank in regard to this, and that in the meantime he would speak to some of his friends; he wanted to see what could be done; he wanted to see the property go on. He then asked Mr. Steele [the secretary of the Levert Company] how much we had to our credit. * • * I asked Mr. Steele how much we had to our credit on the books, and if it would cover the interest, and he said it would about cover it; he had not made up his statement yet, but it would about cover it; that the amount was about $6,000 to our credit. I then asked Mr. Steele to apply this, and we would go and see what could be done. * * * Q. Xou told Mr. Steele to apply what? A. To apply this to our interest, and we would go and see what could be done. When we left, Gen. Levert cautioned us to have you [meaning the counsel representing the Moore Company] go and see the bank, and not to go myself, and we then left the office.”
The testimony of Mr. McNaughten is about to the same effect. Gen. Levert admits that the interview took place, and that he declined to make further advances to the Moore Company ; but he denies that he expressed himself as willing to hold his notes on payment of the interest. He says:
“I remember I mentioned, incidentally, I believe, that all I wanted was that my interest be protected; that is, the plantation, my interest involved in the property. All I wanted was to have my interest protected. I remember mentioning that.”
In other respects, his testimony was rather hesitating and confused and in several particulars he fell into errors which indicated that his memory was not accurate.
Mr. Steele testifies that he did not hear the conversation in question, hut that, before it took place, Mr. Moore had asked him “how his account stood,” and that he had told him that he did not know, but that he would write up the account and send it to him; that Mr. Moore did not tell him to charge up the amount to their credit to the interest; that he did so, in making up the account, because that was the custom, the universal practice, and had been so for years, especially with the Moore Company.
Within two weeks from January 1st the Levert Company placed the matter of its claim against the Moore Company in the hands of its attorney, who discussed it with the attorney representing the Moore Company, informing him that the Levert Company, while disposed to allow the Moore Company time within which to make such arrangements as it might find practicable, wanted the debt due it paid, in whole or in part, and, if in part, further secured for the balance, and further informing him that, pending the settlement of the matter or the negotiations, he would advise his client to make certain moderate advances in order to keep up the property; and it appears that the information so conveyed was promptly acted upon, for the Moore Company enlisted the services of Mr. H. S. Armstrong, who undertook to get up a syndicate to buy the property, and on January 18, 1913, Mr. Moore, the vice president, wrote to the Levert Company as follows:
“Our Mr. H. S. Armstrong advises us that you will allow us four or five weeks to arrange for the financing of this year crop, and that you will meet the pay rolls for work done during this period; hence we are taking the liberty of drawing on you for $829.00, which amount is for actual labor pay rolls for plowing and preparation of land for planting. We trust that you will honor our draft. Should you wish to know about the work done, you will please inquire of Mr. Armstrong, who was here to-day and saw the work. * * * ”
The Levert Company replied on January 20th, saying:
“Our attorney, Mr. Dufour, who had been in consultation with your attorney, Mr. Beattie, was unexpectedly called out of town last week and will not return until next Monday. But before leaving he instructed us not to make any payments until his return. Immediately on Mr. Dufour’s return we will advise you if we will honor your draft or not.”
On January 24th Mrs. Moore, president of the Levert Company, wrote to "Gen. Levert:
*84 “I am writing to request you, as a personal favor, in the event you will not let us have advances for this year, not to foreclose or cause the expenses of putting your notes in the hands of an attorney for collection, thus causing attorney’s fees, without giving some days’ notice. Please let me know how long you will wait before doing this. * * * ”
To which Gen. Levert, on January 27th, answered:
“In answer to your letter of the 24th inst., Mr. Dufour has charge of the claim and has taken up the matter with Mr. Beattie. * * *»
Upon the same day that she wrote to Gen. Levert Mrs. Moore wrote to Mr. Beattie, saying, inter alia:
“Our troubles seem to have reached a climax, and a sale is inevitable. * * * ”
On January 27th Mr. Dufour wrote to Mr. Beattie, informing him that Gen. Levert had handed him Mrs. Moore’s letter of the 24th, and saying:
“In view of this letter and my recent conversation with you, it might be well to let General Levert’s position be clearly understood. The General is not willing to advance during the coming year; he has expressed a willingness to wait a few weeks, provided he is assured that steps have been or are being taken to discharge the mortgage notes held by him. This matter was placed in my hands several weeks ago, and, in line with my statements,- I have been exercising the forbearance promised. Unless I receive assurance from you that steps are being taken and will shortly be consummated, I shall find it necessary to bring foreclosure proceedings, and of course General Levert will stand upon his contract. If it be practicable to obtain the consent of all parties in interest to permit the property to be sold amicably, at public auction, after a two weeks’ notice by advertisement, the General will be willing to this course, and I will be willing to take one-half the fee, to which I am entitled under the contract. * * * I beg to ask that you will let me hear from you within the next few days. Time is passing, and, unless something is done, the situation can only become more complicated. * * *”
Mr. Beattie appears to have received the letter thus quoted upon the day of its date, and immediately wrote to Mrs. Moore, informing her of its contents, and saying:
“From this letter, it appears that General Levert will not wait, and therefore we shall have to act as quickly as possible.”
He then advised her to write to Gen. Levert and request him, in ease of foreclosure, to sue on only one note, in order to lessen the expense in the way of attorney”s fees and sheriff’s commissions, and he adds:
“I received your letter this morning and note that you say that I should wait a reasonable time on Mr. Armstrong before myself undertaking to get a purchaser. I shall be guided by your directions; but, in view of Mr. Dufour’s letter, I advise all haste possible. * * * ”
On January 28th Mrs. Moore wrote to Gen. Levert:
“We are making every effort to secure a purchaser for our property who will pay the debt due you. I wish to assure you that we are acting with all haste in this direction. * * * Should you feel that the delay which we request, indeed which I personally request, is beyond what you consider reasonable under the circumstance. I beg to request you, General, that you advise me several days in advance that, if we are unable to secure a purchaser or purchasers, you will begin action after a certain date, which you will specify in your notice to me. * * * ”
On February 3d Mrs. Moore again wrote to Gen. Levert that they were using every effort to find a purchaser, that she was grateful for the forbearance which had been shown, and that she would ask him, in case he found it necessary to foreclose, that he would sue on one note, in order to keep down the expense.
Later in February Mr. Beattie wrote to Mr. Dufour that he believed that energetic efforts were being made to find a purchaser for the property, but that personally he had nothing to do with those efforts. He argued, however, that Gen. Levert was sufficiently secured, and expressed the- hope that he might not find it necessary to take immediate steps to enforce payment of the debts due him.
On March 1st Mr. Armstrong obtained a written proposition from several gentlemen to organize for the purpose of buying from *86 him the Moore Company property, with the understanding that he should buy it for the amount of the outstanding indebtedness, not to exceed $215,000; and thereafter he and his associates had an interview with Gen. Levert and his counsel, at which they submitted a proposition which contained no provision for the payment or reduction of the debt due to the Levert Company, and which' Gen. Levert declined to accept.
On March 22d, Gen. Levert submitted a counter proposition, to which no reply was made, and Mr. Armstrong and his associates dropped the enterprise. In the meanwhile, in March, Mr. Beattie appears to have entered into some negotiations with parties whom he thought might buy the property, or find a purchaser for it; but the effort was not successful. He then negotiated with one of the parties referred to with reference to advances, and some time in April received a proposition to the effect that advances, to the extent of $32,000, would be made, provided “the mortgage holders would agree to extend their notes beyond the time that harvesting would be completed,” which proposition was not, however, acceptable to the Levert Company, as holder of the first mortgage.
It appears, therefore, that throughout all the correspondence and negotiations subsequent to January 1st and down to April 11th there had been no suggestion, from any source, to the Levert Company that it had become bound by a verbal agreement, entered into on January 1st, to extend the payment of the notes held by it.
On April 11th, however, counsel for the Moore Company wrote quite a long letter to counsel for the Levert Company, in the course of which he says:
“If General Levert does not want to extend, thereby allowing the Godehaux Company the advantage of buying the cane, won’t he take the place of the Godehaux Company, make the advances, and buy the cane, at the same price?”
And, by way of postscript to his letter, he adds:
“In the above letter, when reference is made to General Levert’s granting an extension of his mortgage and of his notes, of course I refer to a written extension, such as Godehaux, or any other third person desiring to make advances, would be willing to act upon. I say this because I am informed that -many of the statements made by General Levert during the last three months or more have been such as to amount to an extension of his notes. I personally do not know anything of these matters, and I don’t want you to take them in any other way except as a wish on my part not to' waive any existing rights, if there be such, in favor of the Moore Company.”
The suggestion that there had been any such extension as that referred to was promptly denied in a letter from the counsel for the Levert Company of date April 12th, and on April 14th the receipt of the letter thus mentioned was acknowledged by counsel for the Moore Company, who took occasion to say that he was—
“still hopeful that General Levert will not foreclose his mortgage,” etc.
On April 22d counsel for the Moore Company again wrote at some length, and concluded by saying:
“You can understand that, while the Moore Company may contend that General Levert agreed to an extension of his notes, telling them that they could get advances elsewhere as he could not advance them, yet this verbal extension is not sufficient for us to obtain from any one tire advances for this year’s crop, and I ask, therefore, that General Levert give us the written extension that is necessary to obtain advances. At any rate, I ask that you let me know, in advance of your taking any action in court, of your intention.”
On April 23d, after the order for the issuance of executory process had been made, the Moore Company made a tender to the Levert Company of $3,000, to cover the interest in consideration of the payment of which it is said that the Levert Company agreed to grant time for the payment of the notes held by it. We make the following ex *88 cerpt from the letter, by means of which, in part, this tender was made, to wit:
“The amount herewith tendered you is for all interest due on said mortgage notes up to and inclusive of January 15, 1913, together with 8 per cent, interest on the interest, so due, from January 15, 1913, to this date. This interest is tendered you in view of your statement that, if interest should be paid on said mortgage notes up to and inclusive of January 15, 1913, the said notes would be continued this calendar year, and time would be granted for the payment thereof during this calendar year, so that the owners of said plantations, mortgaged to secure said notes, could obtain advances for the cultivation and proper management of said plantations during this calendar and crop year. This interest is tendered only in consideration of said extension of said notes and the granting of said time to pay same, and shall be accepted only with the understanding that the said extension and grant of time are allowed.”
Opinion.
[1] The witnesses relied on by plaintiff in injunction testified that the president of the Levert Company said that he would “hold his notes, and that he would be satisfied with the interest”; but there is no testimony in the record to the effect that he mentioned a “calendar year” or “crop year,” or in any manner intimated how long the notes would be held, the reference to time being found nowhere else in the transcript save in the letter whereby, after the suit had been instituted, and the order for the issuance of the writ of seizure and sale had been made, the $3,000 was tendered to the plaintiff in the seizure, on behalf of the defendant.
When mortgaged property consists of a sugar plantation, its value may be very largely depreciated within a year, and there appears to have been no consideration moving to the mortgagee, in this instance, which would have been likely to induce a reasonable man to assume that risk; the mortgagor having already, by the terms of the mortgage and of the notes themselves, bound itself to pay the interest on the $7,000 notes annually, and I to pay the note of $75,000, in principal and interest, on January, 1, 1912.
It will be observed that Mr. Moore does not say in his testimony that there was enough money to the credit of the Moore Company in the hands of the Levert Company on January 1, 1913, to pay the interest then due on the notes held by the last-mentioned company, and, if he was told that there was about $6,000, he must or should have known that that amount was insufficient, and, if he did not know it, he must have acquired that information when he received the account, which bears date January 2, 1913, and the prompt receipt of which is not denied.
Mr. Moore testified, however, that after Gen. Levert had impressed upon him the necessity of finding out whether the Bank of Lafourche (holder of a second mortgage for $25,000 oiu the property in question) would make the necessary advances for the crop, and after he had told Mr. Steele to apply the credit balance (the amount of which he did not know) to the payment of the interest, he further told Mr. Steele that they (Mr. Mc-Naughten and himself)—
“would go out and see what could be done.”
At another place in his testimony, being still under examination by the counsel for the Moore Company, he testified as follows:
“A. Gen. Levert was talking in rather a low tone of voice and seemed worried that he could not make any more advances — anxious to see the place run. Q. Did he say anything of that kind? A. Xes, sir; he said he was anxious to see the place continue running. Q. Was there-anybody else within your hearing except you and Mr. McNaughten? A. No, sir; _ nobody could hear what we three were talking. Q. When you left the office that day, what do you say you told him? A. I said I would go out and see what could be done. I told this to Gen. Levert on leaving. I would see you and have-you speak to the bank, and it was then he informed me not to speak to the bank myself, to-have you go and see them.”
*90 Mr. Moore would seem, therefore, to have told both Mr. Steele and Gen. Levert that he (or he and McNaughten) would go out and see what could be done, meaning, apparently, that he would go out and see whether something could be done that was suggested to, or was expected of, him as a result of his interview with Gen. Levert. And he went out; but one might say he never came back any more, since he did not reappear for more than a month, and then only because Gen. Levert had written to Mrs. Moore to tell him to call, and he had not then accomplished anything in the way of providing either for the debt due to the Levert Company or for the advances required by the Moore Company.
Our conclusion about the matter is that if, when Gen. Levert informed Messrs. Moore and McNaughten that he would not make the advances, and they asked him whether he expected his notes to be paid, he answered that he would hold the notes and would be satisfied with the interest, he meant nothing more than that he was not then demanding the payment of the notes held by his company, but would give the Moore Company an opportunity to go out and see what it could do in the way of making provision for operating the plantation, or of making such other arrangement as it might find practicable; the idea being, as it seems to us, that Moore and McNaughten would report the result of their efforts, and- that upon a consideration of that report by Gen. Levert a more definite understanding in regard to the debt due to the Levert Company would be reached. It seems incredible that a business man, having a debt due him, exceeding §100,000, secured by mortgage on a going sugar plantation, should pledge himself, without consideration, and without limitation as to time or change of conditions, not to demand payment of any part of the principle of such debt, merely upon the verbal promise of the debtor to comply with his obligation, already reduced to the form of an authentic act, importing confession of judgment, to pay the interest. And that the Moore Company viewed the matter in that light is evident from the fact that the letter whereby it tendered the §3,000 for interest declares that Gen. Levert agreed that, “if interest should be paid up to and inclusive of January 15, 1913, the said notes would be continued for this calendar year,” whereas, as we have already stated, neither Moore nor McNaughten, nor any other witness, has suggested in his testimony that anything was said in any interview with Gen. Levert about the payment of interest or the extension of time' for payment of the notes to any particular date. So that, considering the case as presented by the evidence, and applying the argument of the counsel to the case so presented, we should have to find that, with over §100,000 invested in a mortgage upon a sugar plantation, a large proportion of the value of which was made up of its plant cane and stubble and the condition in which it was maintained, the mortgagee, for no consideration whatever, bound himself, in a mere conversation, in which no time was mentioned, to stand by and allow the owner to do with the plantation as he pleased, or as he might be able, during the whole of a calender year. The fact that the Moore Company did not place upon the language used by Gen. Levert the construction which it now asks this court to place upon it is further made evident in this, that it was definitely informed, within two weeks after that language is said to have been used, that the attitude of the Levert Company was that it would foreclose its mortgage, unless some satisfactory arrangement should be made with regard to its debt, and during 'the almost incessant interchanges of views *92 which followed, for a period of nearly three months, in which the Levert Company repeatedly defined its position, the attitude of the Moore Company and of its counsel and officers was merely that of a debtor seeking indulgence from his creditor, but asserting no legal right thereto. •
In People’s Bank v. Ballowe, 34 La. Ann. 565, it was held by this court that:
“Where an injunction issues against executory process on the ground of extension of time by the plaintiff, the debtor’s evidence must be positive and precise to show such fact.”
[2] In Faries v. Ranger, Fatman & Co., 35 La. Ann. 104, it was held that:
“In the construction of an ambiguous contract, the safest mode is to ascertain the intention and meaning of the parties to the contract, as shown by their own acts, and by the manner in which they proceeded to the execution of the same.”
In Breard v. Blanks, 51 La. Ann. 1507, 26 South. 618, it was held that:
“Where it is apparent that contracting parties have not understood each other, their rights in the subject-matter of the contract will be determined from their acts and deeds with reference thereto, and not from their contradictory assertions of the agreement, given at the trial of a suit instituted for a settlement of their interests growing out of the contract.”
See, also, Moore v. Beiseker, 147 Fed. 367, 77 C. C. A. 545; Long-Bell Lumber Co. v. Stump, 86 Fed. 574, 30 C. C. A. 264.
The rule thus stated- as to the construction of contracts is equally applicable to the question of contract vel non. In the instant case we are of opinion that there was no contract. We do not enter upon the consideration of the case of Milliken & Farwell v. Sweet Home Co., Ltd., 123 La. 998, 49 South. 669, to which we are referred by counsel for the Moore Company ¿ for the reason that it does not appear to us to be in point; the facts being essentially different from those here disclosed.
The judgment appealed from, which dissolved the injunction, is therefore affirmed.